IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

02 MAY -2  PH 2: 14

GARY D. MCFARLAND
CLERK

| | |
|---|---|
| EDWARD E. GATZ AND DONALD D. GRAHAM, individually and on behalf of those similarly situated, and EDWARD E. GATZ AND DONALD D. GRAHAM, derivatively on behalf of Regency Affiliates, Inc.<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM R. PONSOLDT, SR.; STATESMAN GROUP, INC.; WILLIAM R. PONSOLDT, JR.; MARC H. BALDINGER; STEPHANIE CAREY; MARTIN J. CRAFFEY; AND REGENCY AFFILIATES, INC.<br><br>Defendants. | Case No. 4:02CV 3113<br><br><br>**VERIFIED COMPLAINT** |

Edward E. Gatz and Donald D. Graham, individually and on behalf of those similarly situated, and Edward E. Gatz and Donald D. Graham, derivatively, bring this direct and derivative action, stating as follows:

## INTRODUCTION

1.      This is a class action and derivative action against an executive officer, director and controlling stockholder of a publicly traded company, who has and continues to implement a fraudulent scheme to loot the corporation for his personal gain, and against the other directors of the company who failed to stop the fraudulent actions described in this complaint.

2.      This action is brought on behalf of all shareholders of Regency Affiliates, Inc. other than Defendants and affiliated persons as described below (the "Class"), who are shareholders of Regency Affiliates, Inc. ("Regency"), a publicly-traded corporation, the stock of

which is traded on the over-the-counter market. This action is also brought derivatively on behalf

of Regency, against William R. Ponsoldt, Sr. ("Ponsoldt") and a corporation he dominates and

controls, Statesman Group, Inc. ("Statesman"), for a fraudulent scheme implemented by

Ponsoldt to use his power to control the affairs of Regency and carry out a series of self-dealing

transactions that were (and are) adverse to the interests of the Class and damaging to Regency

and its shareholders, and against the other members of Regency's Board of Directors as of

October 17, 2001, for the breach of their fiduciary duties of loyalty and due care.

3.      In addition to money damages, this action seeks declaratory and injunctive relief

against Ponsoldt and Statesman's unlawful scheme to completely dilute the cash value and

voting power of the shares owned by the Class and to seize control of a valuable interest in a

limited partnership that owns real estate located in the Washington, D.C. area, which interest is

potentially valued in excess of $100 million.

### JURISDICTION AND VENUE

4.      This Court has jurisdiction over the claims for relief under 18 U.S.C. §§ 1964(a)

(Equity) and 1964(c) (Right to Sue and Treble Damages) of The Organized Crime Control Act of

1970, Pub. L. No. 91-452, Section 901(a), 84 Stat. 941, Racketeer Influenced and Corrupt

Organizations ("RICO") and 28 U.S.C. § 1331(a) (Federal question); this Court further has

jurisdiction under 28 U.S.C. § 1332 because of diversity of citizenship of the parties and because

the claims are in excess of $75,000 exclusive of interest and costs.

5.      Personal jurisdiction and venue are predicated upon 18 U.S.C. § 1965(a) and (b)

and 28 U.S.C. § 1391(b) and (d) since the Defendants have transacted business in the District of

Nebraska and many of the acts and occurrences in furtherance of the claims alleged herein arose

in the District of Nebraska.  Until 1999, Regency's principal place of business was Omaha, Nebraska.

**PARTIES**

6.    Plaintiffs are:

(a)    Edward E. Gatz ("Gatz") is a resident and citizen of Omaha, Nebraska, and is the registered owner of 61,370 shares of common stock of Regency.  Gatz has brought this action in his individual capacity, as representative of the Class, and derivatively.

(b)    Donald D. Graham ("Graham") is a resident and citizen of Omaha, Nebraska, and is the registered owner of 1,064 shares of common stock of Regency.  Graham has brought this action in his individual capacity, as representative of the Class, and derivatively.

7.    Defendants are:

(a)    Ponsoldt is a resident and citizen of the State of Florida, but is believed to be in the process of expatriating himself and permanently moving his person outside the jurisdiction of the Securities and Exchange Commission, which is presently conducting an investigation into some of Ponsoldt's wrongful activities involving Regency.    Ponsoldt has personally transacted business in this District with respect to the claims asserted herein.  At all times relevant herein, Ponsoldt has acted with scienter and with the intent to injure the Class and Regency as alleged herein.

(b)    Statesman is a corporation organized under the laws of the Bahamas and has its principal place of business in Nassau, The Bahamas.  Statesman presently claims to own approximately 38.9% of the outstanding shares of common stock of Regency and in excess of 99% of the outstanding shares of Series C Preferred Stock of Regency and has conducted business in this District in connection with the transactions described herein.  At all relevant

times herein, Statesman is dominated and controlled by Ponsoldt.  Statesman representatives have participated in shareholder meetings held in this District.

(c)     William R. Ponsoldt, Jr. ("Ponsoldt Jr.") is the adult son of Ponsoldt who is a resident and citizen of the State of Florida.  Ponsoldt Jr. was appointed to the Regency Board of Directors by Statesman and has served as a Director of Regency since July 1993.  Ponsoldt Jr. received options to purchase shares of Regency's Series C Preferred Stock from Statesman at the time of his appointment in 1993.  Ponsoldt Jr. has conducted business in this District in connection with some of the transactions described herein, and is an indirect owner of stock in Statesman.

(d)     Marc H. Baldinger ("Baldinger") is a resident and citizen of the State of Florida and has been a member of the Board of Directors of Regency since August, 1999.  Since 2001, Baldinger has served as the Chief Financial Officer of Regency.  Baldinger has traveled to this District to attend board and shareholder meetings of Regency.

(e)     Stephanie Carey ("Carey") is a resident and citizen of the Bahamas and was appointed to the Regency Board of Directors by Statesman and has served as a Director of Regency since July 1993.  Carey received 100,000 shares of Regency common stock from Statesman at the time of her appointment in 1993.  Carey previously shared the same business address as Statesman and has executed stock powers on behalf of Statesman in connection with Statesman's sales of Regency common stock.  Carey has traveled to this District to attend board and shareholder meetings of Regency.

(f)     Martin J. Craffey ("Craffey") is a resident and citizen of the State of New York.  Craffey was appointed to the Regency Board of Directors by Statesman and has served as a Director of Regency since July 1993.  Craffey received options to purchase shares of

Regency's Series C Preferred Stock from Statesman at the time of his appointment in 1993. Craffey has traveled to this District to attend board and shareholder meetings of Regency.

(g)     Regency Affiliates, Inc. is a corporation organized and existing under the laws of the State of Delaware, and presently has its principal place of business in the State of Florida. Regency is named as a nominal defendant for purposes of the derivative action and also to the extent the declaratory and/or injunctive relief sought herein affects the rights of Regency.

## CLASS ACTION ALLEGATIONS

8.     Plaintiffs assert some of their claims as a class action pursuant to Fed. R. Civ. P. 23 on behalf of all similarly situated shareholders, which Class would expressly exclude all Defendants and affiliates.

(a)     The Class consists of more than 2,400 shareholders and is so numerous to make joinder of all members impracticable.

(b)     There are questions of law common to all members.

(c)     The claims of the representative Plaintiffs are typical of the Class.

(d)     The representative parties will fairly and adequately protect the interests of the Class.

## BACKGROUND FACTS

### Organization and Control of Regency

9.     Regency was organized as a Delaware corporation in 1980 under the name Transcontinental Energy Corporation to become the successor-in-interest to Transcontinental Oil Corporation. In late 1984 and early 1985, Regency, all of its wholly-owned subsidiaries, and 21

affiliated limited partnerships filed for protection under Chapter 11 of the Bankruptcy Reform Act of 1978, as amended.

10.    In late 1988 and early 1989, the operating results of two subsidiaries of Regency were poor, and all operations were closed down and liquidated. Another Chapter 11 bankruptcy was filed for the steel operations of Willbanks Steel Corporation ("Willbanks").

11.    As of April 15, 1992, Regency turned over its stock investment in Willbanks to the bankruptcy trustee and reached a settlement agreement with all senior lenders, resulting in the issuance by Regency of a new series of preferred stock. This new series of preferred stock (the "Series B") was issued to two institutional lenders.

12.    In 1992, an investor group also completed the implementation of a plan to completely restructure Regency ("Restructuring Plan") to attempt to locate a business combination partner who could return Regency to profitable operating status. The Restructuring Plan was funded by the offering of $400,000 of 11% Restructuring Serial Promissory Notes (the "Notes") issued by Regency and the issuance of 260,037 of Series A Preferred Stock convertible into approximately 1,381,000 shares of Common Stock.

## FRAUDULENT SCHEMES TO DILUTE THE

## CASH VALUE AND VOTING RIGHTS OF THE CLASS

### Ponsoldt and Statesman Acquire Control of Regency
### for Property at Fraudulently Inflated Prices

13.    One aspect of the scheme involved Ponsoldt and Statesman acquiring control of Regency by transferring indirect rights in aggregate rock at fraudulently inflated prices to Regency, and subsequently causing Regency to transfer the same aggregate rock to a majority-

6

owned subsidiary of Regency to reduce the liquidation value of the shares owned by the Class by approximately $18,200,000.

14.     At the same time the Restructuring Plan was rolled out, Regency entered into an Agreement for Acquisition dated December 12, 1992 ("1992 Acquisition Agreement") with Sunriku International Investments, Ltd., which provided for Regency's acquisition of 80% of the outstanding stock of National Resource Development Corporation (Delaware) ("NRDC-Delaware") in exchange for securities of Regency and its subsidiary. At that time NRDC-Delaware was a wholly-owned subsidiary of International Aggregate Company, a company owned by an affiliate of Statesman and Ponsoldt.

15.     NRDC-Delaware owned approximately 75,000,000 short tons of previously quarried and piled aggregate rock located in Iron Mountain, Michigan (the "Aggregate"), and was originally to receive 888,500 newly issued shares of Regency's Series C Preferred Stock, $11,120,000 of 9% secured promissory notes, and 2,700,000 shares of Regency Common Stock.

16.     Following the failure of the parties to consummate the transactions contemplated in the 1992 Acquisition Agreement, on June 4, 1993, Regency entered into an agreement to acquire 80% of the common stock of NRDC-Delaware from Defendant Statesman, a Bahamian international business corporation that had its principal place of business and principal office located at 400 East 54th Street, #2-F, New York, New York 10022. Ponsoldt and Statesman took an active role in the NRDC transaction.

17.     On June 29, 1993, NRDC-Delaware was re-incorporated under the laws of the State of Nevada ("NRDC") by Statesman and acquired title to the Aggregate, and on July 7, 1993, 2,975,000 shares of Regency's Common Stock, 208,850 shares of Regency's Series C Preferred Stock and 20% of the outstanding shares of Transcontinental Drilling Co. were

delivered to Statesman. Immediately following the July 7, 1993 acquisition, Statesman owned approximately 28.8% of the common shares of Regency and 100% of the outstanding shares of Regency's Series C Preferred Stock. The terms of the Series C Preferred Stock provide that Regency shall have the right to redeem the shares of Series C Preferred Stock at a price equal to the lesser of: (1) $20,885,000; or (2) the fair market value of the common stock of NRDC acquired by Regency (the "Redemption Price"). The holders of the Series C Preferred Stock are also entitled to a liquidation preference equal to the lesser of: (1) the net proceeds of the Aggregate or (2) the Redemption Price (the "Liquidation Value").

18.   Also on July 7, 1993, Statesman designated eight persons to fill existing vacancies on the Board of Directors of Regency, including Defendants Carey, Ponsoldt Jr., and Craffey, each of whom received shares of Regency common stock and/or options to purchase shares of Regency's Series C Preferred Stock from Statesman.

19.   Statesman, in addition to receiving the 28.78% of Regency's Common Stock, received irrevocable proxies over 855,991 shares of Regency's $.40 par value common stock which entitled Statesman to vote approximately 34% of the outstanding shares of Regency as of December 31, 1993.

20.   For purposes of the July 7, 1993 acquisition, the Aggregate owned by NRDC was valued for financial statement purposes at $15 million. In fact, the Aggregate has a minimal value.

21.   (a)   From July 7, 1993 to December, 2001, NRDC made only casual and insignificant sales of the Aggregate.

(b)   In December, 2001, NRDC now alleges it has sold all of the Aggregate to Iron Mountain Resources, Inc., a 75% owned subsidiary of Regency, at an alleged purchase price

of $18,200,000, payable with interest at 2.46% in 96 equal payments of principal and interest commencing December, 2003.

(c)      Ponsoldt and Statesman will use this "sale" to increase the Redemption Price and Liquidation Preference of the Series C Preferred Stock directly owned by Statesman and beneficially owned by certain members of the Regency Board of Directors, to $18,200,000, which will entitle them to preferential liquidation status over the shares owned by the Class in the event they are allowed to consummate their fraudulent scheme.

### Regency Acquires a Valuable Asset, "Security Land"

22.      Pursuant to a private offering commenced September 1, 1994, Regency issued $500,000 of Units consisting of 12.5% Cumulative Convertible Series E Preferred Stock and Regency Common Stock, par value $.40 per share, to help fund an equity investment in a partnership interest in Security Land & Development Company Limited Partnership, a Delaware Limited Partnership ("Security Land"), which owns an office building with 717,011 net usable square feet occupied entirely by the Social Security Administration ("SSA") pursuant to a lease which is scheduled to expire on October 31, 2003.  The office building is located on a 34.3 acre site at 1500 Woodlawn Drive in Woodlawn, Maryland, and is adjacent to and connected with SSA's headquarter campus.  In 1994, approximately 3,800 employees occupied the building.

23.      The investment in Security Land was a direct result of the efforts of Gary Spahn and Gary K. Nuttall ("Nuttall"), both of whom have served as Chief Executive Officer of Regency.

24.      In making the acquisition of the partnership interest in Security Land, Regency made a capital contribution of $300,000 and committed substantial net operating loss carryovers ("NOLs"), and in return received:

(a)     Allocation of 95% of the profits, losses and cash flow (substantially all of which cash flow is committed to amortize the principal balance of Security Land's real estate mortgage through October 31, 2003) of Security Land through October 31, 2003, and 50% thereafter;

(b)     The right to hold approximately 50% of the partnership interest in Security Land;

(c)     Upon a sale or refinancing of the property owned by Security Land, the right to receive sale or refinancing proceeds in accordance with the partners' positive capital account balances (as of December 31, 2001, Regency was the only partner with a positive capital account balance, and the balance of Regency's capital account at such date was $29,984,078);

(d)     The right to be engaged by Security Land as a consultant to advise on the financing of the office building at an annual management fee equal to the actual federal and state tax obligations of Regency, capped at $100,000 annually through 2003, which fee shall be paid from Regency's 95% participation in cash flow; and

(e)     An express limitation on any obligation to contribute additional capital.

25.     As a result of the acquisition of the partnership interest in Security Land in 1994, Regency acquired a valuable interest in real estate that has a market value ranging from approximately $60 million to in excess of $100 million, depending upon whether the property has been leased, the terms of any such lease, and the creditworthiness of any such tenant.

26.     By facsimile dated October 30, 2000, Larry Horbach advised Ponsoldt that the Committee on Transportation and Infrastructure of the U.S. House of Representatives had passed a resolution authorizing the SSA to enter into a new 15-year lease of the Security Land building at a proposed annual rental of $14,347,396. When the new lease is signed, the value of Regency's limited partnership interest in Security Land will increase significantly, because the

amount of sale or refinancing proceeds to be received by Regency when the property owned by Security Land is sold or refinanced is expected to be significantly higher if the property has been leased to a creditworthy tenant, such as SSA.   Regency has never publicly disclosed the adoption of such resolution relating to the new lease of the Security Land building because it would tend to increase the market price of Regency's common stock, which would result in a corresponding increase in the amount that Statesman would be required to pay to exercise its fraudulently obtained option (as referenced in § 32 herein) and a reduction in the number of shares of Regency common stock that Ponsoldt could cause Regency to issue to pay compensation and bonus accruing under his fraudulent Employment Agreement (as referenced in § 31 herein).

### Ponsoldt Becomes Chairman and CEO of Regency

27.     After the successful investment in Security Land, Ponsoldt, through his control over Statesman and the majority of the Regency Board of Directors, on August 26, 1996, caused himself to be elected Chairman of the Board of Regency, terminated Nuttall as President and CEO of Regency and requested one of the directors appointed by Statesman in July 1993, Pamlyn Kelly ("Kelly"), to serve as Acting Chief Executive Officer.

28.     By facsimile dated September 30, 1996, Kelly, as Acting CEO, sent a letter to Defendants Carey, Ponsoldt Jr., Craffey, and Ponsoldt as well as two others, Larry Horbach and James Koehler, which explained the process of seeking and looking for a new president for Regency.

29.     After a search for a new president for Regency was conducted, the Board of Directors of Regency which was controlled by Statesman and Ponsoldt, decided to hire Defendant Ponsoldt as President and Chief Executive Officer of Regency.

**Fraudulent Compensation Agreement and Option**

30.     On April 14, 1997, Defendant Ponsoldt Jr. faxed a letter to Larry Horbach attaching a letter from Ponsoldt Jr. to Kelly stating Ponsoldt Jr. believed the proposed salary for Ponsoldt was too low.

31.     On June 3, 1997, Regency and Ponsoldt executed an Employment Agreement effective immediately and with no termination date entitling Ponsoldt to the following compensation:

(a)     $250,000 per year salary adjusted annually by any increase in the Consumer Price Index.

(b)     Additional salary ("increased salary") based on a formula tied to the enhancement of the overall net worth of Regency, payable quarterly based upon unaudited financial statements of Regency.

(c)     The right to elect to receive some portion of his salary or increased salary in the form of payments to retirement plans or to purchase life insurance.

(d)     The right to receive at Regency's election at the end of each quarter up to 50% of the increased salary through issuance of "warrants" to purchase the stock of Regency at a price equal to 50% of the average bid price for Regency's stock for the calendar quarter for which such increased salary is payable (the "Warrant Price"); to exercise the Warrants, Ponsoldt had the option to purchase the shares by giving a Promissory Note secured only by a pledge of the shares purchased, payable in a balloon payment five years after the date of the Note.

32.     Also on June 3, 1997, Ponsoldt and Statesman caused the Regency Board of Directors to issue an option to Defendant Statesman allowing Statesman to acquire 6.1 million shares of the common stock of Regency.  The exercise price of the option was to be computed in

accordance with a formula based upon the current market price of the Regency common stock at the time the option was exercised. Ponsoldt repeatedly represented to members of the Regency Board of Directors, Gatz and Graham that the option was necessary to protect the NOLs that had been committed to Security Land, and that Statesman would never exercise the option except to prevent a "hostile takeover" of Regency.

33.     After Ponsoldt became the President and Chief Executive Officer of Regency, Ponsoldt used his control over the affairs of Regency to implement a series of self-dealing transactions that were (and are) adverse to the interests of the Class.

34.     The investment in Security Land was structured in a way that as the loan to Security Land was repaid by the substantial rent paid by the SSA and allocated to Regency, Regency's asset value increased accordingly. Ponsoldt directly reaped the benefits of this valuable transaction under the terms of his one-sided Employment Agreement that was tied to the enhancement of the overall net worth of Regency. Through December 31, 2001, total compensation paid or accrued under the Employment Agreement was not less than $3,751,924, consisting of $1,217,558 in 2001, $781,018 in 2000, $572,593 in 1999, $632,555 in 1998 and $548,200 in 1997.

35.     Because Regency has not generated significant revenues, either at the time the Employment Agreement was entered into or since, Ponsoldt has caused Regency to incur debt, issue stock to Ponsoldt and sell valuable corporate assets to pay the excessive compensation and bonus accruing under the fraudulent Employment Agreement.

36.     On June 24, 1998, Regency refinanced its long-term debt previously outstanding to Southern Indiana Properties, Inc. ("SIPI") and entered into a loan agreement with KBC Bank, N.V. ("KBC Bank"). The KBC Bank loan is secured by Regency's interest in Security Land.

Under the terms of the KBC Bank loan agreement, KBC Bank advanced $9,383,320, of which approximately $6.1 million was used to repay Regency's outstanding obligations to SIPI.  Of the approximately $2.9 million balance of the KBC Bank loan proceeds, approximately $1.8 million was used to pay accrued compensation and bonus under the fraudulent Employment Agreement.

37.     In 1998, Ponsoldt caused the Regency Board of Directors to issue 187,000 shares of Regency common stock to Ponsoldt in payment of accrued compensation under the Employment Agreement.

### Glas-Aire Acquisition and Divestiture

38.     On September 22, 1999, Regency issued a press release announcing the exchange of Regency common stock for control of Glas-Aire Industries Group Limited ("Glas-Aire"), a Canadian corporation involved in the auto parts industry, then traded on the NASDAQ SmallCap market.

39.     On October 16, 2001, Ponsoldt directed Regency to divest Regency's controlling interest in Glas-Aire in exchange for 4,040,375 shares of Regency common stock then owned by Glas-Aire, plus $2.5 million cash, $1.25 million of which was used to pay off certain promissory notes issued to Ponsoldt, representing accrued compensation under the fraudulent Employment Agreement.  Prior to the sale of Regency's controlling interest in Glas-Aire, Glas-Aire was the only subsidiary of Regency generating any significant positive cash flow.  Following the sale of Regency's controlling interest in Glas-Aire, Ponsoldt, Baldinger and other associates of Ponsoldt continue to dominate the Glas-Aire board of directors and management.

### Fraudulent Exercise of Option

40.     After the divestiture of Glas-Aire, Statesman, in direct contravention of Ponsoldt's representation that the option would not be exercised unless there was a hostile

takeover, exercised its option to acquire 6.1 million shares of Regency stock.  Statesman paid the exercise price by delivering a promissory note to Regency.

### Reverse Split and Decrease of Par Value

41.     On January 16, 2002, at an adjourned meeting of the shareholders of Regency held in Nassau, The Bahamas, Ponsoldt orchestrated the adoption of a 1 for 10 reverse split and the reduction of the par value of the common stock of Regency from $.40 to $.01.

42.     The 1 for 10 reverse stock split became effective on February 22, 2002. Immediately thereafter, the market bid price for Regency's common stock decreased from approximately $0.29 per share to approximately $0.11, on a split-adjusted basis.

43.     (a)     As a result of the 1 for 10 reverse stock split, the decrease in the par value and the failure to proportionately reduce the authorized shares from 25 million shares to 2.5 million shares, the Class suffered an immediate and substantial decrease in the cash value of their shares of Regency common stock.  In addition, Ponsoldt and Statesman will be able to further dilute the cash value of the shares owned by the Class.  After the 1 for 10 reverse split, the stock's original $.40 par value should be raised to $4.00 par value.  Instead, the par value after the reverse split was reduced to $.01, and there were still 25 million authorized shares.  This will allow Ponsoldt to issue up to approximately 23 million shares as part of his compensation. Because of the reductions in both market bid price and par value of the shares resulting from the reverse stock split, Ponsoldt will be able to cause the Regency Board of Directors to issue more shares of Regency common stock to pay the same amount of compensation accruing under the Employment Agreement.